IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs June 5, 2018

**TAMAINE WORKS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
No. 04-02521      Chris Craft, Judge

————————————————

**No. W2017-02276-CCA-R3-ECN**

————————————————

Petitioner, Tamaine Works, appeals summary dismissal of his petition for relief under the Post-Conviction DNA Analysis Act, his motion under Rule 60.02 of the Tennessee Rules of Civil Procedure, and his petition for writ of error coram nobis. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Tamaine Works, Mountain City, Tennessee, *Pro Se*.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Amy P. Weirich, District Attorney General; and Karen Cook, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Background*

The facts of this case as set forth by this court on direct appeal are as follows:

The conviction in this case stems from the October 9, 2003 murder of Mr. Keon McChristian (the "victim") in an apartment complex in Memphis. The Defendant, Tamaine Works, confronted the victim in a second floor hallway at the Peppertree Apartments about 10:30 at night and fired four shots from an assault-type weapon, hitting the victim twice. The victim died from his wounds. The Defendant fled the scene

but was arrested by police at the same apartment complex several months later. In March of 2004, the Defendant was indicted by a Shelby County grand jury on one count of first degree, premeditated murder. The Defendant received a jury trial, which was conducted over the course of several days in February and March, 2005.

Before the jury was seated, the trial court took up several preliminary matters. The State presented a motion to exclude the Defendant from introducing testimony concerning the victim's alleged involvement in the death of a friend of the Defendant a few hours prior to the murder at issue in this case. The State argued that any evidence of this prior killing was not relevant. The Defendant presented a motion to exclude the prior testimony of a State witness who was unavailable to testify at trial, alleging that the statement, although made under oath at a preliminary hearing, was unreliable. The trial court granted the State's motion and excluded testimony concerning the prior homicide but denied the Defendant's motion and allowed the prior testimony of the unavailable witness.

At trial, the State's lead witness, Ms. Kimberly Pruitt, testified that on the night of the murder, she was staying with her cousin at the Peppertree Apartments. As she exited her cousin's apartment with her six-year-old son sometime after 10:00 in the evening on October 9, 2003, she passed the Defendant in the hallway on the second floor of the apartment complex building. She recognized the Defendant as someone she had seen around the complex for several years and who was a friend of "Brian," the man her cousin was dating at the time. As the Defendant passed her in the hallway, Ms. Pruitt's cousin, who was immediately behind her, asked: "Tamaine, what you fixin' to do?" Ms. Pruitt stated the Defendant replied, "Shhh," indicating the two women should remain quiet.

Ms. Pruitt stated that at the time, the Defendant was not wearing a shirt, had on black or dark-colored jeans, and was carrying a large gun only partially concealed in a garbage bag. She further stated that the Defendant was only three or four feet from her when they passed in the hallway, and she saw his face. The Defendant walked toward the apartment next door, the residence of a man known as "V." Ms. Pruitt walked the opposite direction toward the stairs, and her cousin went back inside her apartment and closed the door. Ms. Pruitt testified that she then saw the Defendant shoot the victim, which she described as follows: the victim came out of "V's" apartment; the Defendant shot the victim

two times; the victim fell to the floor; the Defendant shot the victim two more times; the Defendant then fled.

Ms. Pruitt testified that after the Defendant fled, she ran to the victim, who said: "He shot me." Ms. Pruitt stated that she called 911 from her cellular phone and reported the incident. She also stated that approximately five or ten minutes after the shooting, "V" came and asked her who shot the victim, but she declined to answer. She further stated that when "V" heard the police arrive, he took off. Ms. Pruitt also testified that the victim did not have a gun. When the police arrived, she was forced to place her hands in the air, but when they learned she was not a threat, she was allowed to leave and did not give a statement to the police the night of the murder.

Ms. Pruitt also testified that she began to receive threats over her cellular phone from the Defendant's friend, who would call and tell her that she did not "need to be testifying against his friend and that something's going to happen to [her] and [her] children if [she] do[es] come forward." Because of these threats, Ms. Pruitt did not make a statement to the police until several weeks later when she was in the hospital.

On cross-examination, Ms. Pruitt admitted she had a felony record. She stated that she did not tell "V" who shot the victim because she was "paranoid." She also stated that "V" did not take anything from the victim, but that "V" was carrying a hand gun. Ms. Pruitt also clarified that while she did not make a statement to the police the night of the murder, she did leave an anonymous tip on the 528-CASH tip-line the following day. However, she then began to receive threats over the phone and therefore did not talk to the police until several weeks later when she was in the hospital suffering from anxiety attacks and no longer wanted to "hold it in." The police came to her hospital room and she gave them a statement. She also admitted that during this meeting she was shown a photographic line-up but could not identify the Defendant's photo because she was on medication that caused blurred vision. However, she did identify the Defendant's photo at trial. She also identified the Defendant in court as the man she witnessed shoot the victim.

Ms. Memorie Noel, the victim's aunt, also testified at trial, stating that she lived in the same apartment complex and heard four gunshots on the evening of the incident at approximately 10:30. Shortly thereafter, a neighbor came to her door and informed her that her relative had been shot. She rushed to the victim, who was lying on the ground, and noted

- 3 -

that also at the scene was "a girl" and "V," whom she identified as Vincent Sulton, who also went by the moniker "Big V" and "V Dog."

Sergeant Gene Hulley, an Investigator with the Memphis Police Department Felony Response Squad, testified that he assisted the crime scene investigators on this case. Although the victim had been removed by the time he arrived, he stated that he observed at the crime scene bullet holes on the building walls, spent shell casings, and a blood stain on the floor. He described the shell casings as consistent with a "large caliber, automatic weapon."

Officer Ellason Flagg of the Memphis Police Department testified that on January 24, 2004, she received a report that the Defendant was at the Peppertree Apartments. There was a warrant for the Defendant's arrest. Officer Flagg stated that when the Defendant saw the uniformed officers, he fled. The officers pursued, eventually captured the Defendant, and placed him under arrest.

An audio tape of Memphis Police Officer Sergeant Sims' testimony at the Defendant's March 4, 2004 preliminary hearing was played for the jury at trial and entered into evidence. Sgt. Sims testified that he attempted to take a statement from the Defendant after his arrest, but the Defendant, after he was advised of his rights, elected to not make a formal statement. However, the Defendant did remark to Sgt. Sims that "wasn't nobody going to make it to testify against him in the courtroom." Sergeant Sims also stated that the Defendant refused to sign the advice of rights form.

Dr. Karen Chancellor, the Chief Medical Examiner for Shelby County, was certified as an expert in the field of forensic pathology, and testified that the victim suffered from a gunshot wound to the lower abdomen that did "extensive damage," and one gunshot wound to the leg. Dr. Chancellor opined that the gunshot wound to the abdomen was the cause of death because it severed two large blood vessels and caused massive bleeding.

Mr. Anton Armour, an acquaintance of the Defendant, was subpoenaed by the State and testified at trial, admittedly against his will, that at some point after the murder he was with the Defendant. They were talking about the past, and the Defendant made the following statement: "Man, you know I'm a real [racial slur], I'm a killer, you can ask them [racial slur] in the Peppertree about me." On cross-examination, Mr. Armour admitted he was a convicted felon.

The Defendant, properly advised of his rights, elected not to testify on his own behalf. The defense [ ] called Sergeant Timothy Cooper of the Memphis Police Department, who testified that when he arrived at the crime scene shortly after midnight, there was no one there who witnessed the crime and was willing to talk to him. Officer William Merritt of the Memphis Police Department testified that he interviewed the Defendant along with Sgt. Sims, and stated that the Defendant did sign the advice of rights form. Officer Merritt also stated that the Defendant never made any incriminating or threatening statements while in his presence, but admitted on cross-examination that there were times when the Defendant was alone with Sgt. Sims.

The defense also called Mr. Vincent Sulton, a.k.a. "V." Mr. Sulton testified that in his initial statement to the police, made about four days after the crime, he stated that he had no personal knowledge of the events on the evening of the murder but knew the Defendant shot the victim because the Defendant had communicated threats, warning him not to talk. However, Mr. Sulton later made a second statement to police in which he recounted that he and the victim were away from the apartments the day of the murder when the victim informed Mr. Sulton he was going to go to his apartment at Peppertree. Mr. Sulton informed police that the victim arrived first, he followed, and he was just coming up the stairs when he heard shots and saw the Defendant with a gun. The Defendant pointed the gun at him and then ran off. Mr. Sulton then informed the police that he was unarmed, went to the victim, took a handgun from the victim, threw it onto the roof, and ran when he heard the police.

On cross-examination, Mr. Sulton gave a third version of the events of the evening, testifying that he in fact did not come up the stairs, but rather was in his apartment when he heard the shots fired, and then came out. He maintained that he did not have a gun until he took one off of the victim, and he then chased after the Defendant. Mr. Sulton further stated that the Defendant called him "not even an hour afterwards" and threatened to kill him. Mr. Sulton also denied having ever told Ms. Turner, Mr. Nelms or Ms. Noel that the gun he had was his and that he retrieved it from off the television set in his apartment.

The State called three rebuttal witnesses: Ms. Roshunda Turner, the victim's aunt; Mr. Damen Nelms, the victim's uncle; and Ms. Memorie Noel, another aunt of the victim and a previous witness. All three testified that they saw Vince Sulton a day after the murder, and he told

them that after the shooting he went into his apartment and got a gun which was located on his television set.

At the conclusion of the trial, the jury returned a verdict of guilty on the indicted charge of first degree, premeditated murder. The trial court sentenced the Defendant to life in the custody of the Department of Correction. The Defendant timely filed a motion for a new trial, which was denied, and this appeal followed.

*State v. Tamaine Works*, No. W2005-01048-CCA-R3CD, 2006 WL 1491636, at *1-4 (Tenn. Crim. App. May 26, 2006).

Petitioner filed a subsequent petition for post-conviction relief. This court summarized the testimonies presented at the hearing on the post-conviction petition as follows:

At the post-conviction hearing, trial counsel testified that he represented the Petitioner in the conviction proceedings. He estimated that he was retained or appointed ten to twelve months before the trial. He said the Petitioner was one of his favorite clients. He said he was never informed of a potential alibi defense. He said the Petitioner never denied shooting the victim. He recalled that he realized the Petitioner was the shooter when the Petitioner became very upset with Kimberly Pruitt, who testified at the preliminary hearing as an eyewitness, because the Petitioner said she was not the person who opened a door and saw him outside an apartment with a big gun.

Trial counsel testified that there were two alternative strategies available. First, the defense might pursue a voluntary manslaughter theory based upon the Petitioner's killing the victim after learning that the Petitioner's best friend had been killed hours earlier. He said the prosecutor seemed to agree with this theory because the prosecutor made a second degree murder plea offer. The second theory was that Ms. Pruitt was lying and that she did not identify the Petitioner when the police showed her photographs while she was hospitalized, even though she had known him for a long time. He said the Petitioner identified another woman as the person who saw him outside the apartment, but the Petitioner could not recall the woman's name. He said that at every meeting before the trial, he and the Petitioner discussed the Petitioner's contention that Ms. Pruitt was lying. He said he talked to Ms. Pruitt at the preliminary hearing and at the trial but did not think he talked to her between them. Trial counsel testified that he wanted to talk to a man who had been inside the apartment and who had given conflicting statements, but he

was not able to do so because the man was represented by counsel. He agreed that he did not do any further investigation of the information disclosed by the State. He said that he did not go to the crime scene to take photographs but that photographs were provided to him. He said he saw no reason to "waste the State's money to send somebody out there to verify what [he] believed to be true." He said that misidentification due to lighting or other conditions was not an issue because Ms. Pruitt claimed to have seen the Petitioner at the door from two to three feet away. Counsel acknowledged that he never looked on the roof at the scene, even though there was evidence that the gun and a liquor bottle were on the roof. He said he did not know about the gun on the roof at the preliminary hearing stage because there was nothing in the affidavit of complaint about it. He said he did not obtain a mental evaluation of a client if he did not appear to need one. He said there were no alternative theories of how the shooting occurred.

Trial counsel testified that it was apparent to him early in his representation that either the Petitioner was present when the Petitioner's best friend was killed or the Petitioner received the information about the killing from someone. He said the Petitioner was adamant that he was not present. Counsel said he wanted to interview any witness who told the Petitioner about the killing and asked the Petitioner if there were any witnesses he should investigate. He said they discussed this "very paramount issue" before the trial. He said the Petitioner did not want him to call any witnesses relative to a heat of passion defense. He said that the prosecutor seemed to understand that the crime occurred in the heat of passion and that they attempted to negotiate a plea agreement, but the Petitioner was not interested. He said he intended to present a heat of passion defense, but the trial judge ruled that the defense could not present this theory unless the Petitioner or another witness provided relevant testimony. He said he argued that the ruling infringed upon the Petitioner's Fifth Amendment right not to give evidence against himself. Counsel said that his conversations with the prosecutors involved the heat of passion defense and that he did not anticipate they would ask the court to exclude evidence of a heat of passion defense unless the Petitioner testified. He said that until the day of the trial, he assumed that the heat of passion defense could be developed through his cross-examination of witnesses and that he would not need other witnesses on this point. It never occurred to him that the State would object to evidence of a heat of passion defense. He thought the question of relevance occurred to one of the prosecutors on the Friday before the trial began on Monday when he said that the Petitioner might not testify.

Trial counsel testified that after the court ruled that the defense must establish the relevance of a heat of passion defense, he talked to the Petitioner. He advised the Petitioner to consider the plea offer or to tell him where to find the woman who told the Petitioner about the earlier shooting. He said that he wanted to call the woman as a witness but that the Petitioner "absolutely did not want to do that." He thought that at the time, the Petitioner did not want to disclose that he was the shooter. He said, however, that the Petitioner never affirmatively said he was the shooter. Counsel said the only eyewitnesses were the woman in the apartment and Mr. Sulton, who did not see the shooting but removed the victim's gun.

Trial counsel testified that the State decided not to call Vincent Sulton to testify in order to avoid evidence about the prior shooting. He said that although he could not use Mr. Sulton to establish the prior shooting, he called Mr. Sulton as a defense witness to show that Mr. Sulton took a gun from the victim. He agreed that self-defense could have been a defense theory but said it was not considered because it was clear that the Petitioner shot the victim to avenge his best friend's killing.

Trial counsel testified that he presented the testimony of a police officer who canvassed the area near the scene to show that no one had any information about the shooting. He presented this evidence to rebut the testimony of the State's witnesses who said they had been at the scene ready to talk to the police. He said he also called Detective Merritt to rebut a police officer's prior testimony that was unfavorable to the Petitioner. He said that he unsuccessfully opposed admission of the prior testimony as unreliable but that the court admitted it because the officer died before the trial.

On cross-examination, trial counsel testified that before representing the Petitioner, he had represented about thirty defendants in murder cases. He said he had more jury trial experience in first degree murder cases than other cases. He was a former law clerk for a court of criminal appeals judge, and he did criminal trial and appellate work once he entered private practice.

Trial counsel testified that self-defense was not a viable option. He said the viable options were a voluntary manslaughter defense and establishing reasonable doubt by showing that the State's main witness lied. He acknowledged that he was somewhat thwarted by the State's late tactical move. He reiterated that the Petitioner did not provide any information about an alibi. He said the Petitioner told him repeatedly

about crying as the Petitioner's best friend was taken away in an ambulance, to die later.

Trial counsel testified that he hired investigators in murder cases when there was a need for an investigation or if there were things a client told him that were not covered by the discovery materials. He said there was not a need for an investigator in this case and noted that the Petitioner's account was consistent with the State's facts. He said that a substantial amount of time elapsed before he received Mr. Sulton's statement about the gun and that he did not think an investigator would have found the gun after he learned of the statement. He also said he did not know how he would be able to establish after one and [one-half] years that the gun was the victim's. He said that for the first six months of his representation, the Petitioner maintained that Ms. Pruitt's account could not be correct, but that the Petitioner did not admit he was at the scene. He said the Petitioner eventually admitted the type of gun he had, the garbage bag over the gun, and what he was trying to do. Counsel acknowledged that his cross-examination of Ms. Pruitt was unsuccessful but asserted that he made his best effort. He said that his trial strategy included emphasis on Ms. Pruitt's previous failure to identify the Petitioner and that a motion to suppress evidence of the identification procedure would have been counterproductive.

Trial counsel testified that the State's first settlement offer was for twenty years. He said he reviewed the offer, the sentence, and the required percentage of service with the Petitioner. He discussed the State's second offer for fifteen years with the Petitioner. He said the State made an offer for thirteen and one-half years during the trial, which the Petitioner refused. He said that he and the Petitioner felt good about the trial when the Petitioner turned down the third offer. He said he was used to clients refusing good offers and denied getting angry at the Petitioner or treating him differently.

Trial counsel testified that the Petitioner was one of his favorite clients because the Petitioner was communicative about what he did and did not want. He said the Petitioner agreed with the direction of the case. He said he had good rapport with the Petitioner's mother, as well.

With respect to the appeal, trial counsel testified that he reviewed his notes and the transcript to determine the appellate issues. He said his appellate strategy was not to raise every possible issue because doing so detracted from the issues which offered the best possibility for relief. He said he maintained communication with the Petitioner throughout the

appellate process, although there were not many occasions for updates. He said the appeal was unsuccessful, which was not unusual in criminal cases.

Trial counsel acknowledged that he may have prompted one of the prosecutors to realize that the State could challenge the defense's ability to cross-examine witnesses about heat of passion evidence. He said he "joked" with one of the prosecutors before the trial by indicating the Petitioner might not testify. He said it was not unusual to be equivocal with a prosecutor about whether a defendant would testify. He said that had he known the State would challenge the admissibility of cross-examination evidence of the prior shooting, he would not have relied on the State to call Mr. Sulton as a witness or expected to be able to cross-examine Mr. Sulton about the prior shooting. He said he met with the Petitioner after the trial court's ruling and advised him that the fifteen-year offer was "not such a bad offer any more." He said the Petitioner was adamant that he would not accept the plea offer and that he wanted counsel to challenge Ms. Pruitt's testimony that she was at the scene. He advised the Petitioner that they could make the prior homicide relevant if the Petitioner had a witness who would testify that he or she saw it and told the Petitioner about it. He said the Petitioner, however, did not want to get "her" involved. He stated that after the court ruled against the defense, he was concerned about the defense and determined that the options were for him to convince the Petitioner to plead guilty, for the Petitioner to testify, or for him to convince the jury that the State failed to sustain its burden of proof.

On redirect examination, trial counsel acknowledged that he pursued the voluntary manslaughter theory even though he knew the Petitioner did not want to testify. He thought the reason and state of mind for the killing would be clear to the jury even if the Petitioner did not testify. He said one of the prosecutors acknowledged to him that the verdict might be voluntary manslaughter. He identified his billing records, which he said were created when he prepared his billing statement about one year after the case concluded. He identified an entry which showed he delivered the fifteen-year offer two months and two days before the trial and said it probably was the same day he received the offer. He said there had been a previous twenty-year offer when he received the discovery information.

Sherrill Royston, the Petitioner's mother, testified that she was present at the Petitioner's trial. She said that after Mr. Sulton was questioned about the location of the victim's gun, she overheard one of the prosecutors tell

- 10 -

other State's witnesses that they must testify that the gun was on a television set, not thrown on the roof, in accord with Mr. Sulton's testimony. She said that afterwards, one of the victim's family members testified to that effect. She thought the witnesses involved were family members of the victim, but she could not identify them by name.

On cross-examination, Ms. Royston testified that the prosecutor said, "[Y]ou're going to have to say exactly word for word what the first witness has said. . . . [Y]ou're going to have to say that." She said that four or five of the people testified. She said she had stepped out of the courtroom to pray when she heard the prosecutor instruct the witnesses about their testimony. She said she was holding her Bible but was not reading it. She acknowledged her prior statement to a defense investigator in which she said she was reading her Bible when she overheard the prosecutor's instructions. She said she mentioned the prosecutor's actions to trial counsel but did not recall when she told him about it.

On redirect examination, Ms. Royston testified that she had not had the opportunity to review the statement she gave the defense investigator or to correct any misinterpretations. She said she had her Bible open and was praying when she overheard the prosecutor's instructions to the witnesses.

Summer Hampton testified that she married the Petitioner after he was in prison. She recalled the date of the crime because it was the same day that [Eric Robinson], the Petitioner's friend, was killed. She said that she learned of [Robinson's] killing about 7:30 p.m. that day but that she did not tell the Petitioner. She did not know if the Petitioner knew of the incident. She said the Petitioner came home to the Petitioner's aunt's apartment about 8:30 p.m. and did not leave the apartment that night. She claimed the Petitioner was with her when the victim in the Petitioner's case was killed. She said her three children were with them at the apartment. She said that the Petitioner's aunt, Mary Barnes, came home about 9:00 p.m. and that Ms. Barnes was now deceased. She said she and the Petitioner went to bed before 10:00 p.m. and awakened the next morning around 6:30. She said that no one ever asked her about the evening of the victim's homicide.

On cross-examination, Ms. Hampton testified that neither she nor the Petitioner was working at the time of the crime. She was about twenty-five and the Petitioner about twenty two at the time. She said they awakened at 6:30 a.m. in order to get her son ready for school. She

maintained that they went to bed around the same time every night. She said they discussed Mr. [Robinson's] homicide that night. She was not present when Mr. [Robinson] was killed and did not know where the Petitioner was before he came home. She said Kimberly Longmeyer told her about Mr. Robinson's death.

The Petitioner testified that trial counsel failed to communicate with his alibi witnesses. He said he tried to talk to counsel about the witnesses and denied that he told counsel not to talk to them. He said the alibi witnesses were Summer Hampton, Mary Cole Shelby, Latoya Banks, and Mary Barnes. He said Mr. [Robinson] took him to see Ms. Shelby, his parole officer, around 4:00 or 5:00 p.m. He said Ms. Banks was a resident of the apartment complex where Mr. [Robinson] was killed and could have testified about what happened there. He claimed counsel told him that the State made a settlement offer of twenty years at eighty-five percent and that they would have to go to trial if he did not accept the offer because the State would not budge. He said counsel never communicated a fifteen- or thirteen-year offer to him. He claimed he asked counsel to see if the State would accept a fifteen-year offer. He said that after the trial, he asked counsel about the fifteen-year offer and that counsel said he thought he told the Petitioner about it and apologized if he did not.

The Petitioner testified that trial counsel advised him not to testify and said the State would question him about his "charges." He claimed he wanted to testify but said he deferred to counsel's wisdom from experience. He denied that trial counsel reviewed the evidence with him. He stated that he asked counsel to hire an investigator but that counsel said he was going to rely on the State's information. He said he wanted an investigator to make photographs from different angles than the State's photographs and to look on the roof for the gun. He also wanted an investigator to search for a woman named Ranita, whom he said may have provided information to Ms. Pruitt. He stated that counsel assumed he was present when the victim was killed but that he was not. He said he tried to tell counsel that counsel could show that Ms. Pruitt was not truthful about being present when the victim was killed.

The Petitioner testified that had he testified at his trial, he would have said he had nothing to do with the crime. He said he would have testified that he was at Graceland Farms with Ms. Hampton, Ms. Barnes, and the children.

- 12 -

On cross-examination, the Petitioner testified that he complained to trial counsel in person about counsel's performance. He acknowledged a letter he sent counsel on January 26, 2006, which was after the Petitioner's March 2005 trial, in which he said that counsel was doing his job. He said he was appreciative of the "little things" counsel did at the time. He also acknowledged a September 2005 letter in which he asked if he could take the fifteen[-]year offer, even though this was after his trial.

The Petitioner testified that trial counsel gave him the discovery materials. He said he did not receive some of the materials, such as the preliminary hearing transcript, until after his trial. He denied that he and counsel reviewed the discovery materials together or that counsel discussed them with him. He said it was counsel's decision, not his, that he not testify, but he acknowledged that he heeded the advice of counsel in this regard.

On redirect examination, the Petitioner testified that he wanted to testify about his alibi defense at his trial. He said Ms. Hampton could have corroborated his alibi. On recross-examination, the Petitioner testified that Ms. Hampton was present outside the courtroom during his trial. He thought he came home around 8:00 or 8:30 on the night of the crime. He said he bathed, ate, and went to bed. He did not recall what time he went to bed. He said that they watched a movie and that they did not talk about anything.

Assistant District Attorney General Dean DeCandia testified that he participated in the Petitioner's trial. He said he spoke with witnesses before the trial and denied that he advised them how to testify. He specifically denied that he told the witnesses how to testify during the rebuttal proof. He said that he might leave the courtroom to get something from his office or to use the restroom but that he would not leave to talk to a witness who had not yet testified.

On cross-examination, General DeCandia testified that at some point, some of the witnesses made the prosecutors aware that Mr. Sulton's statements made after the crime were inconsistent with his trial testimony. He did not recall whether he advised defense counsel. He said Mr. Sulton gave conflicting statements to the police, first claiming he was not present for the shooting and only heard about it, but later saying he came to the scene after he heard shots and took a gun from the victim. He said that during cross-examination, Mr. Sulton first claimed he had not been at the scene but later said he was in his apartment when

- 13 -

the shooting happened and took a gun from his television stand and went toward the Petitioner.

General DeCandia testified that the fifteen-year offer was made during the trial. He saw trial counsel lean over and speak to the Petitioner. He stated that almost immediately thereafter, counsel advised him that the Petitioner rejected the offer.

The [post-conviction] court denied relief in a detailed order. The court discredited the testimony of the Petitioner and accredited that of trial counsel. The court found that the Petitioner was not denied the effective assistance of counsel. The court did not, however, address the allegation that the Petitioner was entitled to a new trial due to prosecutorial misconduct. This appeal followed.

*Tamaine Works v. State*, No. W2011-00209-CCA-R3PC, 2012 WL 2951925, at *4-10 (Tenn. Crim. App. July 20, 2012).

*Analysis*

### A. Petition for Post-conviction DNA Analysis

As noted above, Petitioner sought both post-conviction relief and error coram nobis relief. For consistency, we will refer to the lower court as the post-conviction court. Petitioner argues that the post-conviction court erred by denying his petition for post-conviction DNA analysis. The Post-Conviction DNA Analysis Act of 2001 ("The Act") allows petitioners convicted and sentenced for certain homicide and sexual assault offenses in which biological evidence may have existed to request post-conviction DNA testing. T.C.A. § 40-30-303. The Act contains no statutory time limit and extends to petitioners the opportunity to request analysis at "any time," regardless of whether such a request was made at trial:

> [A] person convicted of and sentenced for the commission of first degree murder . . . may at any time, file a petition requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence.

*Griffin v. State*, 182 S.W.3d 795, 799 (Tenn. 2006) (citing T.C.A. § 40-30-303). A post-conviction court is obligated to order DNA analysis when the petitioner has met each of the following four conditions:

- 14 -

(1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;

(2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;

(3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

T.C.A. § 40-30-304; *see also Griffin*, 182 S.W.3d at 798. Additionally, if DNA analysis would have produced a more favorable verdict or sentence if the results had been available at the proceedings leading up to the conviction or sentence, then the post-conviction court may order DNA analysis when the petitioner meets the same conditions. T.C.A. § 40-30-305; *see also Griffin*, 182 S.W.3d at 798. In either instance, some physical evidence must be available and in a proper condition to enable DNA analysis. T.C.A. §§ 40-30-304(2), -305(2).

A petitioner's failure to meet any of the qualifying criteria is fatal to the action. *See William D. Buford v. State*, No. M2002-02180-CCA-R3-PC, 2003 WL 1937110, at *3 (Tenn. Crim. App., Nashville, Apr. 24, 2003). Moreover, the Act does not specifically provide for a hearing as to the qualifying criteria and, in fact, authorizes a hearing only after DNA analysis produces a favorable result. *See* T.C.A. § 40-30-312.

The post-conviction court has considerable discretion in determining whether to grant relief under the Act, and the scope of appellate review is limited. *See Sedley Alley v. State*, No. W2006-01179-CCA-R3-PD, 2006 WL 1703820, at *5 (Tenn. Crim. App., at Jackson, June 22, 2006). In making its decision, the post-conviction court must consider all the available evidence, including the evidence presented at trial and any stipulations of fact made by either party. *Id*. The lower court may also consider the opinions of this court and the Tennessee Supreme Court on direct appeal of the petitioner's convictions or the appeals of the petitioner's prior post-conviction or habeas corpus actions. *Id*. On appellate review, this court will not reverse unless the judgment of the lower court is not supported by substantial evidence. *Id*.

In his brief, Petitioner makes the following argument concerning this issue:

The trial court relied upon past alleged evidence about the forensic testifying of the shell casings, however by not allow[ing] a proper response from the district attorney general your appellant was effectively denied his day in court to present exculpatory evidence to the court,

- 15 -

[J]udge Craft already had formed a bias [sic] opinion due to his acting as prosecutor (being a former prosecutor in Shelby County) and judge in this case. He (the trial court judge) refuses to address or admit that Shelby County District Attorney General & Office has and will hide exculpatory evidence from the defense, as happen [sic] due to a regular course of business.

The appellant in this case demands that due process be followed and he be allowed to test [a]ny and [a]ll forensic evidence in this case, [up to] and including [a]ll evidence that was preserved on the body of the deceased. This shall establish the actual innocence of this appellant. After thoroughly reviewing the record and the applicable law, it is requested that this Court of Criminal Appeals conclude that there is reversible error in the trial courts judgment. *Haddox vs. State*, 2004 WL 2544688; *Schaffer vs. State*, 2011 WL 2120169.

In his petition for post-conviction DNA analysis, Petitioner asserts that "the positive result of forensic tests would have along with the mis-identification of this petitioner by a main witness; Vincent Sulton exculpated this petitioner of any and all involvement in this alleged crime." He further asserts that "[h]ad the forensic evidence recovered in this case been effectively tested for DNA against the petitioner, the end results would have shown that Petitioner was not involved in this crime," and he states that "the mere fact that the shell casings that were forwarded to the Tennessee Bureau of Investigation [TBI] . . . laboratory for testing failed to be tested for DNA."

In the order denying Petitioner's request for DNA analysis, the post-conviction court said:

This Court had heard expert testimony repeatedly in other cases it has tried that DNA cannot be recovered from fired cartridge cases due to the extreme temperature (@ 3,000 degrees) that a cartridge reaches when the powder in it is ignited. Even assuming that DNA could be recovered from the cartridges, however, and could be analyzed and show that the DNA on the cartridges did not belong to the petitioner, this fact at most would only be able to show that someone other than the petitioner may have at some time prior to the shooting touched those cartridges. Any possible results of any DNA testing on those cartridges, if ordered by this court, would never be able to demonstrate the innocence of the petitioner or have resulted in a more favorable verdict or sentence, pursuant to Tenn. Code Ann. § 40-30-304 or -305.

We agree with the post-conviction court. As pointed out by the State, in *State v. Malcolm Witherow*, No. E2012-00131-CCA-R3-CD, 2013 WL 3353338 (Tenn. Crim.

App. June 28, 2013), Dr. Laura Boos of the TBI, an expert in serology and DNA, testified that "it is not uncommon for DNA to be undetected on shell casings, because the heat produced by the firearm degrades DNA." *Id*. at \*6. Thus, even assuming that another person's DNA was found on the shell casings, this finding would not have changed the outcome of trial.

Because Petitioner's request fails to pass the first procedural hurdle, it is not necessary to consider the remaining factors because all four factors must be satisfied to warrant DNA testing under either provision. *Powers v. State*, 343 S.W.3d 36, 48 (Tenn. 2011). Petitioner is not entitled to relief on this issue.

## B. Motion Under Rule 60.02 of the Tennessee Rules of Civil Procedure

Petitioner, citing Rule 60.02 of the Tennessee Rules of Civil Procedure, argues the following:

> The petitioner claims entitlement to prove ["]Actual Innocence" in this case, on the grounds that the State violated the requirements of *Brady v. Maryland* . . . when it failed to surrender the statements of Preston M. Rucker; Moniqica L. Rucker; Kendrick Crutcher; Warlean Williams; Terrance Antwane Jones; Cornelius Green; Henry Schoefield & Vincent Sulton . . . Further, the District Attorney General, [      ] having committed perjury during his testimony in prior Post-Conviction proceedings. It comes to light now that a witness statement concerning a gun being in possession of a victim of a violent crime where Mr. Sulton removed the gun from the victim, the Shelby County District Attorney General was seen instructing the State witnesses to testify to the same set of facts.

Petitioner further states that the "issue of prosecutorial misconduct calls for an investigation" and that the assistant district attorney general  "improperly coerced the states witness(es) <u>Ms. Rosundra Turner, Mr. Damen Nelms or Ms. Memorie Noel</u>, to testify falsely concerning Vincent Sulton['s] testimony about being in possession of a handgun, further instructing them to testify to the same statement, that Mr. Sutton retrieved the gun from inside of his house from the top of the TV in his apartment." (emphasis in original).

Rule 60.02 of the Tennessee Rules of Civil Procedure provides, in pertinent part, that

> On motion and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise

- 17 -

or excusable neglect; (2) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (3) the judgment is void; (4) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that a judgment should have prospective application; or (5) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1) and (2) not more than one year after the judgment, order or proceeding was entered or taken.

As previously noted by this court:

> Judgments of conviction are criminal matters and are therefore not governed by the rules of civil procedure. Instead, they are governed by the rules and statutes dealing with criminal procedure. For this reason, Petitioner's reliance on Rule 60.02 of the Tennessee Rules of Civil Procedure is misplaced.

*Duane M. Coleman v. State*, No. M2012-00848-CCA-R3-PC, 2013 WL 948430, at *2 (Tenn. Crim. App. Mar. 11, 2013), *no perm. app. filed*; *see also Andre L. Mayfield v. State*, No. M2012-00228-CCA-R3-HC, 2012 WL 5378078, at *2 (Tenn. Crim. App. Oct. 26, 2012) ("Petitioner's reliance on Tennessee Rule of Civil Procedure 60.02 is misplaced because the Rules of Civil Procedure are limited in their application to civil matters."). Therefore, Petitioner is not entitled to relief on this issue.

### C. Petition for Writ or Error Coram Nobis

Petitioner argues that he is entitled to due process tolling of the statute of limitations for his petition for writ of error coram nobis based on "newly discovered evidence of actual innocence." More specifically, Petitioner alleges that the State withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963).

A writ of error coram nobis is a very limited remedy which allows a petitioner the opportunity to present newly discovered evidence "which may have resulted in a different verdict if heard by the jury at trial." *Workman v. State*, 41 S.W.3d 100, 103 (Tenn. 2001); *see also State v. Mixon*, 983 S.W.2d 661 (Tenn. 1999). The remedy is limited "to matters that were not and could not be litigated on the trial of the case, on a motion for new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas proceeding." T.C.A. § 40-26-105. Examples of newly discovered evidence include a victim's recanted testimony or physical evidence which casts doubts on the guilt of the Petitioner. *Workman*, 41 S.W.3d at 101; *State v. Ratliff*, 71 S.W.3d 291 (Tenn. Crim. App. 2001); *State v. Hart*, 911 S.W.2d 371 (Tenn. Crim. App. 1995). The supreme court

has stated the following concerning the standard to be applied when a trial court reviews a petition for writ of error coram nobis:

> [T]he trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

*State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007). Whether to grant or deny a petition for writ of error coram nobis rests within the sound discretion of the trial court. *Id.* at 527-28.

A petition for writ of error coram nobis must be dismissed as untimely filed unless filed within one (1) year of the date on which the petitioner's judgment of conviction became final in the trial court. *Mixon*, 983 S.W.2d at 670. The only exception to this is when due process requires a tolling of the statute of limitations. *Workman*, 41 S.W.3d at 103.

Petitioner does not dispute that his petition for writ of error coram nobis was not timely filed. A judgment becomes final, and the one-year coram nobis statute of limitations begins to run thirty days after entry of the judgment in the trial court if no post-trial motion is filed, or upon entry of an order disposing of a timely filed post-trial motion. T.C.A. § 27-7-103; *Mixon*, 983 S.W.2d at 670. In this case, Petitioner was convicted on March 3, 2005. It is not clear from this record whether he filed a motion for new trial but in any event, Petitioner did not file his petition for writ of error coram nobis until October 27, 2017, well past the time that a motion for new trial would have been denied. In addition to being untimely filed, the trial court also found that Petitioner had not alleged any grounds that would toll the statute of limitations. The court concluded:

> [T]his court has examined the allegations made by the petitioner in his lengthy petition and finds all of his allegations are merely conclusory. As one example, the petitioner alleges repeatedly that the State put on false testimony and did not give him *Brady* material at trial. However, he alleges no newly discovered evidence that any trial testimony was false, and cites no witness statements not furnished that appear to this court to be *Brady* material. Witness statements are not required to be produced prior to trial unless they contain *Brady* material. As one example, he quotes on page 27 of his petition the affidavit of complaint stating that trial witnesses Pruitt and Sulton knew the petitioner well, and then states that they could not have known him well because he was

newly released from the Shelby County Penal Farm. This is not newly discovered evidence that would have led to a different result at trial, but merely statements of opinion made by the petitioner. Ms. Pruitt's and Mr. Sulton's credibility was thoroughly explored at trial and on post[-]conviction. As another example, he alleges that his co-defendant confessed, and that the State concealed this statement from him. However, he had no co-defendant. He is merely wishing to re-litigate his trial and the credibility of the witnesses that testified at the trial. This part of his filing styled "writ of error coram nobis" is also dismissed.

The post-conviction court properly dismissed petitioner's petition for writ of error coram nobis. In his brief on appeal, Petitioner argues that he is entitled to error coram nobis relief because the "prosecution suppressed [a]ll of the attached Exhibits(s) and prevented these issues of Constitutional dimension from being litigated." Petitioner further states that the "Shelby County District Attorney General denied any *Brady* requests made by the petitioner, however, a viewing of the District Attorney General's file in this matter revealed the withheld *Brady* material." However, in *Nunley v. State*, 552 S.W.3d 800 (Tenn. 2018), the supreme court recently held that "an error coram nobis proceeding is not the appropriate procedural vehicle for obtaining relief on the ground that the defendant suffered a constitutional due process violation under *Brady*. The appropriate procedural mechanism to seek relief for a *Brady* violation is a post-conviction proceeding." *Id*. at 819. Therefore, Petitioner is not entitled to relief on this issue.

## CONCLUSION

Accordingly, the judgment of the post-conviction court is affirmed.

_____
THOMAS T. WOODALL, JUDGE